UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————

)
MAC S. HUDSON and )
DERICK TYLER, )
 )
   Plaintiffs, )    CIVIL ACTION
  v. )    NO. 01-12145-RGS
 )
KATHLEEN DENNEHY, in her official )
capacity as Commissioner of the )
Massachusetts Department of )
Corrections, )
 )
   Defendant. )
———————————————————— )

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. SUMMARY

The Department of Corrections (the "DOC") is not entitled to summary judgment: there are multiple issues of fact that require a brief trial for the Court to resolve. The question of whether the DOC's policies impose a substantial burden on the plaintiffs' religious exercise depends primarily on what the plaintiffs' sincerely held religious beliefs are. The Court cannot make this determination without hearing live testimony from the plaintiffs. Once the plaintiffs establish that the DOC's policies impose a substantial burden on their religious exercise, the burden shifts to the DOC to prove that its policies are the least restrictive means of furthering a compelling governmental interest. The DOC cannot meet that burden on a motion for summary judgment in view of the DOC's own contradictory policies, the policies of the United States Bureau of Prisons, inconsistent statements of DOC personnel, and the lack of admissible evidence that the DOC's security concerns are based on anything more than rumor and hearsay.

## II.  **LEGAL FRAMEWORK**

"A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" *De-Jesus-Adorno v. Browning Ferris Indus.*, 160 F.3d 839, 841–42 (1st Cir. 1998) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995)).  In making this determination, the Court views the record on summary judgment in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all credibility issues in favor of the non-moving party—in this case, the plaintiffs. *See Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 51 (1st Cir. 2000); *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir. 2000).

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides the legal framework under which the Court should conduct the summary judgment inquiry.[1] RLUIPA prohibits the DOC from:

> impos[ing] a substantial burden on the religious exercise of [the plaintiffs], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

---

[1] The DOC attempts to cast the Court's summary judgment decision as one in which the Court should analyze the various considerations that enter into a decision whether to grant injunctive relief.  The plaintiffs respectfully suggest that the Court should not attempt to decide whether and how to exercise its equitable discretion to remedy the violation of the plaintiffs' civil rights before determining that those rights are indeed being violated.  The DOC's analysis of these factors depends heavily on its assertion that no violation of the plaintiffs' rights is taking place.  Stripped of this premise, the DOC's argument that injunctive relief is inappropriate collapses.

"The term 'religious exercise' includes any exercise of religion, *whether or not compelled by, or central to*, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added).  The parties agree that the DOC has imposed a substantial burden on the plaintiffs' religious exercise if a DOC "policy has a tendency to coerce the [plaintiffs] into acting contrary to [their] religious beliefs."  Def.'s Mem. at 7.[2]  As this Court wrote in its July 23, 2004 Memorandum and Order, "[t]he issue in free exercise cases, however, is not whether an adherent has correctly divined the religious commands of his faith, but whether his understanding of what his religion requires, however unorthodox, is based on a sincerely held religious belief.  *Frazee v. Illinois Department of Employment Security*, 489 U.S. 829, 834 (1989)."  July 23, 2004 Mem. & Order at 5 n.3.  "Intrafaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses . . .  The guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."  *Gordon v. Pepe*, No. 00-10453-RWZ, 2004 U.S. Dist. LEXIS 16807, at *7–*8 (D. Mass. Aug. 24, 2004) (quoting *Thomas v. Review Bd. of Indiana Employment Sec.*, 450 U.S. 707, 715–16 (1981), ellipses in original).

## III.   THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER EACH OF THE DOC POLICIES AT ISSUE IMPOSES A SUBSTANTIAL BURDEN ON THE PLAINTIFFS' RELIGIOUS EXERCISE

As illustrated throughout their sworn declarations and interrogatory responses, the plaintiffs have consistently maintained that each of the three DOC policies at issue prevent them

---

[2] The DOC cites *Diaz v. Collins*, 114 F.3d 69, 72 (6th Cir. 1997) for the proposition that "no substantial burden results from a restriction of a particular accommodation if the inmate has ample alternative means to pursue his religion."  *Diaz* does not support this proposition at all.  Rather, the *Diaz* court held that when the plaintiff's religion did not require that he wear a medicine pouch or headband at all times, prison regulations that *permitted possession of these objects in a cell*, but prohibited the plaintiff from wearing these items during the two hours per day that he was out of his cell, did not impose a substantial burden.  *Id.*

from acting in conformity with their religious beliefs.[3]   The DOC cannot seriously contest that the plaintiffs must adhere to the DOC's policies while incarcerated or face additional punishment.   Thus, all three policies at issue coerce the plaintiffs to act in a particular way.   *See, e.g., Gordon v. Pepe*, No. 00-10453-RWZ, 2004 U.S. Dist. LEXIS 16807, at *14 (D. Mass. Aug. 24, 2004) ("Plaintiff is behind bars and depends on the Commonwealth to provide him with nutritionally balanced meals. The choice defendants would force him to make between a healthy diet and his religion beliefs satisfies any definition of coercion.").   Whether those actions are contrary to the plaintiffs' religious beliefs is a question of fact that depends almost entirely on whether the Court finds the plaintiffs' testimony credible.   Since all credibility determinations must be resolved in favor of the plaintiffs on a motion for summary judgment, the DOC is not entitled to summary judgment on the question of whether its policies impose a substantial burden on the plaintiffs.   *See Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 51 (1st Cir. 2000); *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50 (1st Cir. 2000).

## IV.   **THE GENDREAU AFFIDAVIT IS INSUFFICIENT TO CONCLUSIVELY RESOLVE THE QUESTION OF WHETHER THE DOC'S MEAL POLICY IMPOSES A SUBSTANTIAL BURDEN ON THE PLAINTIFFS' RELIGIOUS EXERCISE**

The DOC's refusal to provide Muslim inmates with Halal meals is exactly the sort of unjustified burden on religious exercise that Congress sought to outlaw when enacting RLUIPA. In *Cutter v. Wilkinson*, 544 U.S. 709, 716 n.5 (2005), the Supreme Court quoted the following excerpt from a Congressional hearing:  "A State Prison in Ohio refused to provide Moslems with Hallal food, even though it provided Kosher food.   It claimed Kosher food was available and Hallal food was not . . . .   But, in fact, one firm produces TV dinners religiously acceptable to

---

[3] *See* Exhibits "U", "V", "Y" and "Z" to the attached Second Affidavit of Neal E. Minahan, Esq. ("Minahan Aff.").

both Jews and Moslems.  Had there been a way to force consideration of this product, the result in the case should have been different." (citing Hearing on Protecting Religious Freedom After *Boerne* v. *Flores*, before the Subcommittee on the Constitution of the House Committee on the Judiciary [hereinafter, "Protecting Religious Freedom"], 105th Cong., 2d Sess., pt. 3, p. 11, n. 1 (1998)).

Instead of addressing its failure to provide Halal meals, the DOC stubbornly insists that the alternative/vegetarian meals it provides are, in fact, Halal.  The sole support for this contention is the affidavit of Christopher Gendreau, the DOC's Director of Food Services.  Mr. Gendreau claims to have analyzed the ingredients of the alternative/vegetarian menu to determine whether they menu is Halal.  See Gendreau Aff., attached as Exhibit M to Defendant's Mr. Gendreau, however, is not an expert on Halal meals or any other aspect of Islamic religious practice and the DOC offers no expert testimony that its meals are Halal.  *See* Gendreau Dep. 94:1–11, 94:19–24, Exhibit "A" to Minahan Aff., ¶ 2.[4]  Mr. Gendreau's opinion that the alternative/vegetarian meal is "adequate" to meet a Muslim's religious needs is fatally undermined by the complete lack of understanding of Halal requirements that Mr. Gendreau demonstrated at his deposition.

Q.  Have you ever heard of the term Halal?

A.  Yes.

Q.  And what's your understanding of that word?

A.  My understanding, it applies to a certain form of meat that the Muslims partake in, along the lines of kosher food for Jewish and kosher participants.

---

[4] Moreover, the DOC did not designate Mr. Gendreau as an expert witness or submit an expert report from Mr. Gendreau as required by Rule 26 and this Court's scheduling order in order for Mr. Gendreau to present expert testimony at trial.

```
Q.  Do you happen to know what food products are
    Halal?

A.  No.

Q.  Have you ever heard of the term Haram before?

A.  I've heard of it.  I don't have the definition.

                        * * * *

Q.  Aside from meat, are you aware of any other food
    products that are Halal?

A.  No.

Q.  Are you aware of any other food products that are
    not Halal?

A.  No.
```

*Id.* at 94:1–11, 94:19–24.  Mr. Gendreau's deposition testimony also contradicts the statement in his affidavit that cross-contamination between meat and vegetarian meals is not possible in the DOC kitchens.  *See id.* at 36:13–21 (stating that the DOC has no separate facilities, pots, pans or utensils for the different meals).

Although Mr. Gendreau claims to have checked the ingredients of the alternative/vegetarian meals in the affidavit, he previously testified that he had never actually checked or investigated the ingredients of the alternative/vegetarian meals.

```
Q.  Have you ever looked into whether or not the
    alternative vegetarian meals that are served are
    Halal?

A.  No.
```

*Id.* at 115:13–16.  Even if, sometime after his deposition, Mr. Gendreau began to inspect each ingredient in the alternative/vegetarian diet, Mr. Gendreau remains clearly incapable of making an informed analysis as to what is or is not Halal.

Mohammad Mazhar Hussaini,[5] a genuine expert in Halal ingredients and Islamic dietary laws, states:

> A meal is not Halal simply because it does not contain meat.  Many otherwise vegetarian food products contain ingredients that are Haram.

Report of Mohammad Mazhar Hussaini ("Hussaini Report"), p. 2, Exhibit "B" to Minahan Aff., ¶ 3.  Mr. Hussaini goes on to provide a list of certain ingredients that are either Haram or questionable that appear to be included in the alternative/vegetarian meals.  *See id*.[6]

In arguing to the Court that the alternative/vegetarian diet satisfies Islamic religious requirements, the DOC could have presented either the opinion of Mr. Gendreau or the DOC's proffered expert on Islam, Taalib Mahdee.  The DOC chose Mr. Gendreau—whose knowledge of Islamic law is wholly deficient—over Mr. Mahdee—who the DOC puts forward as an expert on the subject.  The DOC chose to rely on the less knowledgeable source because Mr. Mahdee does not assert in his expert report that the alternative/vegetarian meals are, in fact, Halal.  *See* Report of Taalib Mahdee ("Mahdee Report"), p. 2, Exhibit "C" to Minahan Aff., ¶ 4.  Instead, Mr. Mahdee cites to an Islamic teaching which permits Muslims to consume Haram ingredients where the alternative is to eat nothing at all.  *See id*.; Mohammad Mazhar Hussaini's Rebuttal to

---

[5] Mr. Hussaini is the Director of the Islamic Society of North America's ("ISNA") Halal Certification Program.  As part of his duties, he travels throughout the United States to inspect  food production, preparation and distribution for Halal certification.  Before joining ISNA in 2005, Mr. Hussaini was the founding President and Executive Director of the Islamic Food and Nutrition Counsel of America ("IFANCA"), which was established as a Halal education and certifying organization in 1982 .  Mr. Hussaini is the current president of the American Halal Foundation, which also provides Halal education and Halal certification.  Mr. Hussaini has a Master's degree in Food and Nutrition, is a Licensed Dietitian in the State of Illinois and served as Regional Nutrition Coordinator for the Department of Public Health for the City of Chicago, Illinois.  *See* Hussaini Report, p. 1, Exhibit "B" to Minahan Aff., ¶ 3.

[6] The menu attached as Attachment 2 to Mr. Gendreau's affidavit was not produced to the plaintiffs during discovery.  Therefore, Mr. Hussaini relied on an older alternative/vegetarian menu in conducting his analysis.  As both menus contain comparable items such as imitation meat products and pudding, Mr. Hussaini's analysis is still on point.  Due to the DOC's failure to produce the current menu, the plaintiffs reserve the right to supplement Mr. Hussaini's expert report to analyze the menu relied upon by the DOC.

Taalib Mahdee's Report ("Hussaini Rebuttal"), p. 4, Exhibit "D" to Minahan Aff., ¶ 5.   Mr.

Hussaini debunks the application of this rule in the prison context, writing:

> This limited exception does not permit Muslims to break Islamic law at every meal, but only in extreme necessity.  Therefore, a Muslim inmate would have to forego eating Haram meals until the breaking point, when the stress is so acute that the Muslim must either eat Haram or perish.  As a nutritionist, I believe that this situation would be detrimental to the health of the Muslim inmate and is not a viable alternative to eating regular, balanced Halal meals.

*Id*. at 4.  As Judge Zobel wrote: "The idea that plaintiff could simply not eat taboo foods . . . would

undercut any notion that the Commonwealth ever has to provide a religious diet for an inmate — or, for

that matter, has to provide a nutritionally balanced diet to inmates." *Gordon v. Pepe*, No. 00-10453-RWZ,

2004 U.S. Dist. LEXIS 16807, at *8 (D. Mass. Aug. 24, 2004).

 The  DOC's  refusal  to  recognize  well-established  Islamic  dietary  requirements

demonstrates the clear need for this Court to intervene and enforce RLUIPA in exactly the way

that Congress intended:  by requiring that Muslim inmates receive Halal meals.

## V. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE DOC'S MEAL POLICY IS THE LEAST RESTRICTIVE MEANS OF FURTHERING A COMPELLING GOVERNMENTAL INTEREST

 The DOC is not entitled to summary judgment on the question of whether its meals

policy is the least restrictive means of furthering a compelling governmental interest, an issue on

which it has the burden of proof at trial.

 The plain text of the statute mandates that the Court apply strict scrutiny to any DOC

policy that imposes a substantial burden on the plaintiffs' religious exercise.  *See Eagle Ins. Co*

*v. Bankvest Capital Corp. (In re Bankvest Capital Corp.)*, 360 F.3d 291, 297 (1st Cir. 2004)

("[I]n any statutory interpretation case, we start with the text of the statute").  The language

Congress chose—"compelling governmental interest" and "least restrictive means"—are terms

of art that have well-established meanings in the law.

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

*Morrisette v. United States*, 342 U.S. 246, 263 (1952).

If the text of the statute leaves any doubt as to whether this Court should apply strict scrutiny, the Court must resolve that doubt in favor of the plaintiffs. RLUIPA provides that it "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). Finally, other courts have recognized that RLUIPA means what it says, stating that "RLUIPA applies strict scrutiny to government actions that substantially burden the religious exercise of institutionalized persons." *Benning v. Ga.*, 391 F.3d 1299, 1304 (11th Cir. 2004).[7] Compelling governmental interests in the prison context are "discipline, order, safety, and security." *Cutter*, 544 U.S. at 723. Cost is not a compelling governmental interest.

This Court denied the defendant's earlier Motion for Summary Judgment on the issue of Halal meals under the less demanding rational basis test set forth in *Turner v. Safley*, 482 U.S. 78 (1987). At that time, the DOC's primary justification for its policy denying the plaintiffs Halal food was that Halal meals would "cost the Department nearly three times more than the regular menu" and that "there is not a consistent and reliable supply of Halal meals available." *See* July 23, 2004 Mem. & Order at 9–10. After the plaintiffs amended their complaint to include claims

---

[7] *See also Warsoldier v. Woodford*, 418 F.3d 989, 1001 n.13 (9th Cir. 2005) ("[U]nder RLUIPA, CDC's regulations must survive strict scrutiny analysis."); *Ragland v. Angelone*, No. 7:02-cv-00786, 2006 U.S. Dist. LEXIS 10277, at *6 (W.D. Va. March 15, 2006) ("RLUIPA returns the strict scrutiny test to prison litigation."); *cf. Grace United Methodist Church v. City of Cheyenne*, 427 F.3d 775, 794 (10th Cir. 2005) (holding that parallel provisions relating to land use in 42 U.S.C. § 2000cc(a) established strict scrutiny test).

under RLUIPA, the DOC backed away from its cost-based rationale[8] and attempted to manufacture a security rationale which they hope will survive strict scrutiny. The DOC has not, however, provided any credible evidence to support this newfound security concern.

The DOC acknowledges that "obtaining pre-packaged Halal meals would eliminate the security concerns surrounding having Muslim inmates prepare the food," but claims that even pre-packaged meals do "not eliminate the concerns that the separate meals would create climate issues within the prison." Def.'s Mem. at 17. These so-called climate concerns are insufficient to justify the DOC's refusal to obtain Halal meals from an outside vendor. The DOC has, since as early as 1997, provided Jewish inmates with Kosher meals from an outside vendor without sacrificing safety or security. *See* Gendreau Dep. 48: 11–13, Exhibit "A" to Minahan Aff., ¶ 2.

The DOC has offered no admissible evidence that providing some inmates, but not others, Kosher meals ever resulted in any incidents of violence or other prison disturbances. When pressed to identify past disturbances or incidents of violence relating to Kosher meals, each of the DOC's witnesses was either unable to identify a particular incident or described an incident that someone else witnessed. *See id.* at 127:22–129:21 (testifying that he had no personal knowledge of any incidents of violence or disturbances relating to Kosher meals); Hallett Dep. 102:17–102:23, Exhibit "F" to Minahan Aff., ¶ 7 (same); Marshall Dep. 68:3–69:14, Exhibit "G" to Minahan Aff., ¶ 8 (same); Hall Dep. 31:5–33:9, 64:23–66:11, Exhibit "H"

---

[8] The Defendant, Commissioner Dennehy, testified as follows:

```
Q.   Is cost a concern for --
A.   No, no.
Q.   I haven't finished the question.  Is cost a concern for the
     decisions about what religious meals are available to inmates?
A.   No.
```
Dennehy Dep. 48:8–13, Exhibit "E" to Minahan Aff., ¶ 6.

to Minahan Aff., ¶ 9 (same); Mitchell Dep. 65:19–69:23, 80:12–84:8, Exhibit "I" to Minahan Aff., ¶ 10 (same).[9]

Tellingly, at least one DOC superintendent has repeatedly acknowledged that providing inmates with Halal meals does not implicate any security concerns.   Luis Spencer, the Superintendent of MCI-Norfolk, submitted a number of official recommendations to the Religious Services Review Committee ("RSRC") that inmate requests for "Halal meals at every meal" be approved.   *See* Religious Services Request Forms, Exhibits "J"–"N" to Minahan Aff., ¶¶ 11–15.   In response to the RSRC's query as to the security concerns implicated by Halal meals, Mr. Spencer repeatedly answered, "No Security Concerns."   *See id.*.   These unambiguous, unscripted statements of Mr. Spencer, a DOC Superintendent, are alone sufficient to create a genuine issue of material fact regarding the legitimacy of the DOC's security concerns.[10]

The DOC can identify only one difference between providing Kosher meals for Jewish inmates and providing Halal meals for Muslim inmates: there are more Muslim inmates than Jewish inmates in DOC facilities.   *See* Spencer Dep. 128:15–129:1, Exhibit "O" to Minahan Aff., ¶ 16.   The DOC suggests that in view of the larger number of Muslim inmates, "the perception of preferential treatment will be unmistakable."   Def.'s Mem. at 16.   However, the

---

[9] That some DOC employees may have heard rumors of disturbances relating to Kosher meals is inadmissible hearsay and insufficient to carry the DOC's heavy burden of establishing that its present meal policy is the least restrictive means of providing a safe and secure prison environment.   "Hearsay evidence is not admissible at trial or for summary judgment purposes, unless it falls within one of the exceptions specified in the Federal Rules of Evidence." *Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc.*, 425 F.3d 67, 76 (1st Cir. 2005) (internal citations omitted); *see also Feliciano v. Rhode Island*, 160 F.3d 780, 787 (1st Cir. 1998) ("Fed. R. Civ. P. 56(e) requires the parties to submit admissible evidence in supporting and opposing motions for summary judgment.").

[10] At his deposition, Mr. Spencer testified that he now believes a climate issue might exist, and that he did not think of that particular security concern when he repeatedly recommended that requests for Halal meals be approved.   *See* Spencer Dep. 66:7–67:13, Exhibit "O" to Minahan Aff. ¶ 2.   Mr. Spencer's decision to toe the party line in response to litigation is unconvincing and cannot eliminate the genuine issue of fact created by his past recommendations, which were not colored by the pendency of this case.

DOC offers no support for this contention which, on its face, makes no sense.  If anything, providing one religious group with special meals while refusing to provide another religious group with analogous meals is more likely to contribute to the perception of preferential treatment than providing all religious groups with the meals required by their respective faiths.

In denying the DOC's first Motion for Summary Judgment on the issue of Halal meals, this Court wrote: "Conspicuously absent from the pleadings is any material establishing in a competent way that no 'consistent and reliable' source of Halal meat is available to the Department."  July 23, 2004 Mem. & Order at 10.  Through discovery it became clear that the DOC has never inquired as to whether any Halal vendors are available to provide meals to Muslim inmates.

```
Q.  Have you ever looked into getting separate meals
    that are termed or labeled Halal?

A.  Never.
```

Gendreau Dep. 107:12–14, Exhibit "A" to Minahan Aff. ¶ 2; *see also id.* at 111:2–7.  Not surprisingly, the DOC has failed to provide any evidence that a suitable and reliable Halal meal vendor is unavailable.

Although the Court placed the burden squarely on the DOC to show that no Halal vendor exists, plaintiffs have conducted their own research and identified a Halal meal vendor in J&M Halal Foods, Inc. ("J&M").  *See* Plaintiffs' Mem. in Support of Mot. for Recon. (Docket No. 67), p. 19.  Plaintiffs have never suggested that J&M is the best or only provider of Halal meals.  Rather, plaintiffs draw the Court's attention to J&M as evidence that such vendors do, in fact, exist.  Instead of offering evidence to demonstrate that there are no Halal vendors available, the DOC instead attempts to discredit J&M through Mr. Gendreau's uninformed affidavit.  Just as Mr. Gendreau is not an Islamic scholar capable of discerning which foods are Halal or Haram, he

is also not a dietician.  *See* Gendreau Dep. 7:16–18, Exhibit "A" to Minahan Aff. ¶ 2.[11]  Despite

his lack of expertise in this area, Mr. Gendreau claims that he has evaluated the nutritional

content of J&M's Halal meals and found them wanting.  *See* Gendreau Aff. ¶ 11.   Mr.

Gendreau's lay analysis is inadmissible and unconvincing.[12]

Refusing to provide Halal meals from one of the many available sources is surely not the

least restrictive means of furthering the DOC's interest in safety and security.   Other prison

systems, including the BOP, provide inmates with Halal meals.  *See* BOP Food Services Manual,

Exhibit "BB" to Minahan Aff. ¶ 29.   The DOC provides Jewish inmates with Kosher meals.  *See*

Def's Statement of Undisputed Facts, ¶ 9.   If other prisons are able to provide Halal meals

without sacrificing safety and security, and the DOC is able to provide Kosher meals without

sacrificing safety and security, then there is at least a genuine issue for trial as to whether

refusing to provide Halal meals is the *least* restrictive means of furthering the DOC's interests in

safety and security.   "Indeed, while one still encounters claims by prison officials that they

cannot possibly run a secure prison system and provide religiously acceptable diets, it is strange

---

[11] In fact, the DOC contracts with an outside dietician to evaluate the nutritional adequacy of its menus rather than asking Mr. Gendreau to make any such determinations.  *See* Gendreau Dep. 26: 2–4, Exhibit "A" to Minahan Aff. ¶2.

[12] Plaintiffs note that J&M is the sole vendor of Halal meals for United States military personnel.  *See* Defense Logistics Agency, Directorate of Subsistence, *Meal, Religious Kosher/Halal*, <www.dscp.dla.mil/subs/rations/programs/rel/relabt.asp> (accessed May 31, 2006), Exhibit "P" to Minahan Aff. ¶ 17.  The United States Defense Logistics Agency awarded J&M and its sister company, My own Meals, Inc., a 3-year, $5 Million contract to provide pre-packaged Kosher and Halal meals for Jews and Muslims in the armed services.  *See* United States Department of the Army, *Army Logistician*, No.2:44–45 (March–April 1997), Exhibit "Q" to Minahan Aff. ¶ 18.  According to the United States Department of Defense, each warfighter receives "one Kosher or Halal certified entrée and religiously certified or acceptable complementary items *sufficient to provide the recommended daily nutritional requirements*."  *See* Department of Defense, Defend America, *Meddling with Menus a matter of taste*, <www.defendamerica.mil/articles/apr2003/a041703d.html> (accessed May 31, 2006)(emphasis added), Exhibit "R" to Minahan Aff. ¶ 19.  While undersigned counsel is no more a dietician than Mr. Gendreau, it seems that a meal nutritionally adequate for a soldier, sailor, airman or marine would also be nutritionally adequate for an inmate confined by the DOC.

that a variety of other prison systems manage just that."   Protecting Religious Freedom, 105th Cong., 2d Sess., pt. 3, p. 11.

## VI.   THE DOC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS RELATING TO JUMAH SERVICES

The DOC does not appear to dispute that the plaintiffs sincerely believe that, as Muslims, they must participate in Jumah services as a community every Friday afternoon.  Nor does the DOC dispute that, when the plaintiffs were confined to the Special Management Unit at Cedar Junction (the "SMU" or "Ten Block"), the plaintiffs were unable to participate in Jumah services.  Unlike inmates in general population, who may attend Jumah services, or inmates confined to the Departmental Disciplinary Unit (the "DDU"), who may participate in Jumah services through closed-circuit television,[13] inmates confined to Ten Block have no way to meet the religious requirement that they participate in Jumah services.

Initially, the DOC attempted to justify this policy by submitting an affidavit from Sherry Elliot claiming that "10 Block is not wired for access to the prison's closed circuit television system."  Second Affidavit of Sherry Elliot, ¶ 3, Exhibit "S" to Minahan Aff. ¶ 20.  This statement is not true, as confirmed by inmates confined to the SMU and the Deputy Superintendent responsible for the SMU.  *See* Pl.'s Motion for Leave to File Supplemental Materials Relating to Jumah Services (Docket No. 54); Mitchell Aff. ¶ 6, attached as Exhibit "F" to Def's Mem.; Mitchell Dep. 32:7–33:7, Exhibit "I" to Minahan Aff. ¶ 10.  In fact, when the DOC was forced to shut the DDU for repairs and housed some DDU inmates on Ten Block, those inmates were able to have televisions in their cells.  *See id*. at 31:23–32:14.

---

[13] The plaintiffs are not pressing their claims relating to access to Jumah services while confined to the DDU in reliance on the DOC's representation that when the DOC reopens the DDU, the DOC will have completed the necessary repairs to ensure that DDU inmates will have access to Jumah services through broadcast by closed-circuit television.

The DOC's new justification is that "[b]ecause SMU custody is designed to be short term and inmates may only possess limited amounts of personal property in their cells, SMU inmates are not permitted to have televisions." Def.'s Mem. at 20. This justification cannot stand in view of the DOC's policy for the DDU, which permits inmates to possess televisions after a period of good behavior. Like the SMU, the DDU is not intended to serve as permanent housing for inmates, but rather for temporary terms of confinement between three months and ten years. Mitchell Aff. ¶ 4.

In response to the plaintiffs' discovery requests, the DOC produced a report giving basic information, including date of discharge if applicable, for the 1,178 times that the DOC sent an inmate to the DDU for the period from April 1, 1992 to the time that the report was generated. *See* Departmental Disciplinary Unit Commitments and Releases, Exhibit "DD" to Minahan Aff. ¶ 31. Of the 950 DDU commitments that had resulted in discharges at the time the DOC generated the report, 115 inmates (12.1%) left the DDU in fewer than 90 days, 310 inmates (32.6%) left the DDU in fewer than 180 days and 573 inmates (60.3%) left in less than one year. The DOC was unable to generate a comparable report for the SMU. *See id.* However, the Deputy Superintendent in charge of the SMU at Cedar Junction testified that the average length of time that an inmate is confined to the SMU is approximately 90 days. Mitchell Dep. 27:1–3, Exhibit "I" to Minahan Aff. ¶10. A number of inmates, including both of the plaintiffs, were confined to the SMU for periods well in excess of 180 days. *See* Hudson Decl. ¶ 12; Tyler Decl. ¶ 12; Mitchell Dep. 27:14–27:20, Exhibit "I" to Minahan Aff. ¶ 10 (acknowledging that some inmates have been in the SMU for over a year).

These facts undermine the DOC's claimed rationale for forbidding televisions in the SMU while permitting them in the DDU. There appears to be no legitimate basis for the DOC's

decision to allow televisions in the DDU, but not the SMU.  In fact, prior to approximately 2002, inmates in the SMU were permitted to have televisions.  *See id.* at 33:3–7.  In view of the past policy for the SMU and the current policy for the DDU, there is a genuine issue of material fact as to whether the DOC's policy forbidding SMU inmates from participating in Jumah services by closed-circuit television is the least restrictive means of furthering the DOC's interest in a safe and secure SMU.

Finally, the DOC argues that the plaintiffs' claims as they relate to the SMU are moot, as neither is presently confined to the SMU.[14]  However, the Court can and should address the plaintiffs' claims on the merits.  By the DOC's own admission, confinement to the SMU is a "temporary" situation that does not last nearly as long as it takes a prisoner to navigate the course of federal litigation to challenge the conditions of confinement at the SMU.  *See* Def.'s Mem. at 20.  Thus, deprivations of federal rights stemming from policies relating to the SMU are exactly the sort of violations of law that are "capable of repetition yet evading review" that federal courts adjudicate notwithstanding arguments that the case is moot.  *See Norman v. Reed*, 502 U.S. 279 (1992) (challenge to election law not moot because elections did not last long enough for issue to be litigated); *Roe v. Wade*, 410 U.S. 113 (1973) (challenge to abortion law not moot because pregnancy did not last long enough for issue to be litigated); *Becker v. FEC*, 230 F.3d 381 (1st Cir. 2000) (claim relating to presidential debates not moot because presidential campaign seasons to short for issue to be litigated).

---

[14] On May 13, 2006, when the DOC filed its motion for summary judgment, Mr. Hudson was not in DOC custody, having been released on bail pending a new trial ordered by the Appeals Court.  On May 16, 2006, the Supreme Judicial Court overturned the Appeals Court's decision.  Shortly thereafter, Mr. Hudson self-reported.  To the best of undersigned counsel's knowledge, Mr. Hudson is presently in the custody of the DOC at MCI-Concord.

**VII.**   **THE DOC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS RELATING TO PRAYER RUGS**

The plaintiffs have already addressed the issue of prayer rugs in their motion for reconsideration (Docket No. 66) and memorandum (Docket No. 67). However, the plaintiffs wish to make the following brief points in response to the arguments raised by the DOC.

Citing *Rasheed v. Comm'r of Corr.*, 845 N.E.2d 296 (Mass. 2006), the DOC argues that its prayer rug ban does not impose a substantial burden on the plaintiffs' religious exercise. However, it is not clear from the *Rasheed* decision that the plaintiff in that case professed any belief that he was required to use a prayer rug. Rather, the Supreme Judicial Court characterized Mr. Rasheed's belief as that his "faith mandates he perform five daily prayers prostrate, in a purified area, completely separate from the impure floor by the use of a prayer rug." *Id.* at 304. The Supreme Judicial Court went on to base its decision on the following reasoning:

> The purpose of the prayer rug is to ensure that Rasheed is not in direct contact with the impurities of the floor when he prays. The record establishes that that purpose is satisfied by the use of a prayer towel that is comparable in size, other than thickness (an irrelevant characteristic) to a prayer rug.

*Id.* at 307.

In this case, the plaintiffs have testified that they believe that their religion requires the use of a prayer rug rather than a towel. *See* Hudson Dep. 144:24–145:5, Exhibit "W" to Minahan Aff., ¶ 24; Tyler Dep. 127:2–19, Exhibit "X" to Minahan Aff., ¶ 25. The prayer rug is steeped in Islamic religious tradition, having been used by the prophet Mohammad himself.

```
Q.   Can you tell me the basis of your belief that
     Muslims, when they say the salats, must use a
     prayer rug?

A.   Well, that's the practice, and it arises from the
     Prophet Mohammad himself in the Hadith which it
     makes references to when he traveled away from
     the masjid, he carried a prayer rug which is a
     personal -- it's supposed to be a representation
```

```
            of the masjid away from the masjid, so that's
            used as a personal communication between you and
            Allah when you make your prayer.
```

Hudson Dep. 141:9–19, Exhibit "W" to Minahan Aff., ¶ 24.  The plaintiffs' beliefs concerning

prayer rugs are informed by their exposure to Islam while growing up.  *See* Hudson's Response

to Int. No. 3, Exhibit "Y" to Minahan Aff., ¶ 26 ("we had an area in our house that was covered

by a large rug… reserved for prayer only.  When visiting my father, we each brought a prayer

rug to make our daily Salats.");  Tyler's Response to Int. No. 3, Exhibit "Z" to Minahan Aff., ¶

27 ("My father used a prayer rug, which he used only for prayer and always put away for

safekeeping in a plastic container…."); Hudson's Response to Int. No. 8 ("a prayer rug is a

spiritual instrument—a personal item that spiritually connects you to Allah during prayer");

Tyler Response to Int. No. 8 (same).

Although the plaintiffs acknowledge that, even in the absence of a prayer rug, a Muslim

must still perform the Salats, this acknowledgement does not diminish the special place that

prayer rugs occupy in Islamic religious practice.  A policy that prevents the plaintiffs from

possessing and using prayer rugs, on pain of sanctions by the DOC, coerces the plaintiffs to act

in a way contrary to their religious beliefs by forcing them to perform the Salats without a prayer

rug.  In so doing, the DOC's policy imposes a substantial burden on the plaintiffs' religious

practice.

In its efforts to justify the prayer rug ban, the DOC misapprehends the "least restrictive

means" test mandated by RLUIPA.  The burden imposed by the DOC's prayer rug ban cannot be

the least restrictive means of furthering the DOC's policies when other prisons, such as the BOP,

permit inmates to possess prayer rugs.  In its papers, the DOC argues that "[t]he fact that . . . the

BOP's limits on inmate personal property may be less restrictive than the DOC, do not call for

the conclusion that the DOC's policy is improper."  Def.'s Mem. at 11.  To the contrary, the fact

that the BOP is able to run a safe, secure system of prisons while permitting inmates to possess prayer rugs under its "less restrictive" personal property policy creates a genuine issue of material fact as to whether the DOC's policy is the *least* restrictive means of furthering the DOC's interest in a safe and secure system of prisons. *Cf. Cutter*, 544 U.S. at 725-26 (noting that BOP policies burdening religious exercise have been subject to strict scrutiny for years without compromising safety and security).

Moreover, the DOC permits inmates to possess items in their cells that are larger, thicker and heavier than prayer rugs, such as mattresses and blankets. Notwithstanding the presence of these items, the DOC is able to locate contraband in cells successfully and satisfy its safety concerns. For many years, the DOC permitted inmates to possess prayer rugs and was still able to ensure the security of its institutions and staff. At most, permitting inmates to possess prayer rugs will marginally increase the amount of time DOC staff must spend searching certain inmates' cells. Thus, the DOC's "security" concerns reduce to concerns about increased time spent by staff and the corresponding increase in the DOC's expenses. While decreasing the amount of money spent by the DOC is surely a legitimate governmental interest, it is hardly a compelling one.

Likewise, the DOC fails to explain how the potential for conflict among inmates stemming from a policy permitting some inmates, but not others, to possess prayer rugs is at all distinguishable from the potential for conflict caused by other aspects of the DOC's property policies that take into account religious exercise. The DOC permits some inmates, but not others, to possess religious items such as, :  Rosary beads for Roman Catholic inmates, *see* DOC Religious Services Handbook ("Handbook"), p. 73, Exhibit "AA" to Minahan Aff. ¶ 28; Tarot cards and runes for Wiccan inmates, *see id*. at 75; rattles and medicine bags for Native American

inmates, *see id.* at 68.  Any of these possessions could potentially create the same type of conflict the DOC alleges would occur from allowing inmates to possess prayer rugs.

## VIII.   THE DOC IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' EQUAL PROTECTION CLAIM

The DOC argues that it "is entitled to judgment on plaintiffs' equal protection claim where they have failed to demonstrate that the differences in the diets available to Jewish inmates and Muslim inmates are the result of a discriminatory purpose." Def.'s Mem. at 21. However, the First Circuit has cautioned that "[t]rial courts should use restraint in granting summary judgment where discriminatory animus is in issue." *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999) (internal quotation marks omitted).  The fact that the DOC provides Kosher meals for Jewish inmates but refuses to provide Halal meals for Muslim inmates is sufficient to create a genuine issue of material fact.  In *Gordon*, 2004 U.S. Dist. LEXIS 16807 at *9–*10, Judge Zobel denied the DOC's motion for summary judgment in analogous circumstances.   In *Gordon*, a Rastafarian inmate sought to secure his right to a religious diet from the DOC under RLUIPA, the Free Exercise Clause and the Equal Protection Clause.    *Id.*  at *9–*10.  Acknowledging that the law requires the plaintiff to show a discriminatory motive in equal protection cases, Judge Zobel noted that such a motive "can in some situations be inferred from the mere fact of differences in treatment." *Id.* (quoting *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)).  The Court held that, based solely on the disparate treatment of Jewish and Rastafarian inmates, genuine issues of fact existed as to the reasonableness of the DOC's actions and whether or not the DOC was

motivated by discrimination.  *Id.* at *10–*11.  The present case is materially indistinguishable from *Gordon.*[15]

## IX.    CONCLUSION

For the foregoing reasons, the Court should deny the defendant's Motion for Summary Judgment and schedule a pre-trial conference.

<div style="margin-left:45%">

Respectfully Submitted,

MAC S. HUDSON and
DERICK TYLER,

By their attorneys,


/s/ Neal E. Minahan
Michael Kendall (BBO#544866)
Benjamin A. Goldberger (BBO#654357)
Neal E. Minahan (BBO#661371)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775
(617) 535-4000

</div>

Dated: June 2, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 2, 2006.

<div style="margin-left:45%">

/s/ Neal E. Minahan
Neal E. Minahan

</div>

BST99 1503805-5.009962.0179

---

[15] The DOC's argument that Kosher meals require separate kitchens while Halal meals do not is based on the DOC's continued disinterest in learning about what it means for food to be Halal.  Halal food, like Kosher food, cannot be prepared in a kitchen or with utensils that are used to prepare food that does not meet religious requirements.  The DOC's willingness to learn about Jewish dietary restrictions while remaining willfully ignorant of Muslim dietary restrictions is further evidence pointing towards a discriminatory motive in denying the plaintiffs' requests for Halal meals.