UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
MAC. S. HUDSON and                  )
DERICK TYLER,                       )
                                    )
        Plaintiffs,                 )          CIVIL ACTION
                                    )          NO. 01-12145-RGS
    v.                              )
                                    )
KATHLEEN DENNEHY, in her            )
official capacity as Commissioner of )
the Massachusetts Department of     )
Corrections,                        )
                                    )
        Defendant.                  )
_____     )

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION FOR JUDGMENT ON PARTIAL FINDINGS

## I.    INTRODUCTION

Over five years after the Plaintiffs filed this case, the Defendant argues that with respect to any claim for which the Plaintiffs failed to fill out a particular form, the Court should dismiss that claim. The Defendant's argument that this particular form is required is based on a reference guide for staff that was never distributed to the Plaintiffs or other inmates. Under the governing regulations, however, the Plaintiffs complied with all available administrative remedies.

Failure to exhaust is an affirmative defense under the Prison Litigation Reform Act of 1995 ("PLRA") and the burden is on the Defendant to prove Plaintiffs' failure to exhaust available administrative remedies at trial. *See Jones v. Bock*, No. 05–7058, 05–7142, 2007 U.S. LEXIS (U.S. 2007); *Casanova v. Dubois*, 304 F.3d 75, 77 & n.3 (1st Cir. 2002). As described more fully below, Defendant has failed to prove that (i) the Plaintiffs' numerous requests were

insufficient per DOC policy; (ii) the DOC's governing regulations requires a special, religious services form; or (iii) the DOC informed Plaintiffs of any special forms or procedures.

Moreover, the Defendant's decision to litigate this case on the merits for five years constitutes a waiver of any argument that the Plaintiffs failed to exhaust available administrative remedies.

## II.     THE PLAINTIFFS EXHAUSTED AVAILABLE ADMINISTRATIVE REMEDIES

Plaintiffs Mac Hudson and Derick Tyler complied with the PLRA by exhausting all available administrative remedies.  Mr. Hudson and Mr. Tyler submitted numerous requests to prison officials regarding Halal meals, access to Jum'ah services, and use of prayer rugs, in compliance with the applicable regulations.  *See* Exs. 13–32.  That the DOC's employees failed to forward these requests to the Religious Services Review Committee (the "RSRC"), is not the Plaintiffs' fault.  To the extent that the Plaintiffs failed to comply with a technical requirement— filling out a special form—the DOC was under an obligation to notify the Plaintiffs of this failure so that they could complete the proper paperwork.   Instead, the DOC simply denied the Plaintiffs' requests, giving them no meaningful opportunity to comply with a secret requirement that they use a special form.   By preventing the Plaintiffs from utilizing DOC grievance procedures, the Defendant is now estopped from raising that failure as an affirmative defense. *See Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004) ("Defendants may also be estopped from raising non-exhaustion as an affirmative defense when prison officials inhibit an inmate's ability to utilize grievance procedures."); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utilizing' is not an 'available' remedy under § 1997e(a).").

A.      **Plaintiffs complied with the DOC's governing regulations in making their**
        **numerous requests.**

The Defendant attempts to demonstrate failure to exhaust administrative remedies by relying on procedures outlined in the Massachusetts Department of Correction Religious Services Handbook (the "Handbook"). The Handbook, which is the only document that purports to require the Plaintiffs to use the special form at issue, is not a binding regulation. As Allison Hallett, Director of Program Services, testified, the Religious Services Handbook is not a DOC policy, but merely an internal reference guide for staff. Ms. Hallett also testified that the Handbook is not distributed or available to inmates. Consistent with Ms. Hallett's testimony, both Plaintiffs testified that the DOC never made the Handbook available to them.

The only properly promulgated regulation relating specifically to requests for religious services is 103 C.M.R. § 403.10(9), which governs requests for religious items, such as prayer rugs. The policy provides that:

> If an inmate has a request for an item that is not on the list of approved religious articles, the inmate should submit his or her request to the Superintendent. The Superintendent will forward the request with a recommendation to the Religious Services Review Committee through the Director of Program Services for review.

The regulation, which is available to inmates, does not require the use of any special form or make any reference to the Handbook. Thus, Mr. Hudson complied with the applicable regulations with respect to his request for a prayer rug when he asked two different Superintendents of MCI-Cedar Junction for a prayer rug. *See* Exs. 23, 28. Both Superintendents failed to comply with the DOC's policy by denying Mr. Hudson's request outright, instead of forwarding the request with a recommendation to the RSRC. *See* Exs. 24, 29 ("The Director of Treatment has already advised you that the institution will provide a prayer towel, as prayer rugs are not permitted. There will be no exceptions to this rule.") (emphasis added). Mr. Tyler wrote similar letters to the Director of Treatment, who did not forward the requests to either the RSRC

or the Superintendent or inform Mr. Tyler that he needed to direct his request for a prayer rug to another authority.  As Ms. Hallett testified, it is incumbent on the Director of Treatment and the Superintendent–not the inmates–to forward religious requests to the RSRC.  Indeed, Ms. Hallett testified that forwarding inmate religious requests to the RSRC is not discretionary, it is mandatory.

Requests for religious diets or access to Jum'ah services do not appear to be governed by 103 C.M.R. § 403.10(9).  Thus, inmates seeking a Halal diet or access to Jum'ah services appear to be required to comply with the Massachusetts Department of Corrections Policy on Inmate Grievances, 103 C.M.R. § 491.00.[1]  The letters written by Mr. Hudson and Mr. Tyler constitute properly submitted grievances under this policy.

---

[1] In *Shaheed-Muhammad v. DiPaolo*, 393 F. Supp. 2d 80, 95 (D. Mass. 2005), the Court outlined the process for grievances in 103 C.M.R. § 491.00 et seq:

> Those regulations define a "grievance" as "a written complaint filed by an inmate on the inmate's own behalf in accordance with *103 C.M.R. § 491.00*." *103 C.M.R. § 491.06*. Classification and disciplinary decisions are not grievable. *103 C.M.R. § 491.08(1)*. The prisoner is required to file a grievance "within ten working days of the actual incident or situation or within ten working days of the inmate's becoming aware of the incident or situation." *103 C.M.R. § 491.08(4)*. Prisoners "may" process their grievances by obtaining an institution grievance form from locations and staff persons designated by the Superintendent. *103 C.M.R. § 491.09(1)*. All grievances are to contain the date of the incident, the name of the inmate's current institution, the name of the institution of complaint, a brief statement of the facts, the remedy requested, and the signature of the prisoner and staff recipient. *103 C.M.R. § 491.09(2)* .
>
> The grievance is to be forwarded to the IGC. *103 C.M.R. § 491.09(3)(C)*. Upon receipt, the IGC is to notify the prisoner that the grievance has been received and ensure that the grievance complies with the regulations. *103 C.M.R. § 491.01(1)*. If the grievance does not comply, the IGC is to return the grievance to the prisoner with a written explanation as to why the grievance does not comply. *103 C.M.R. § 491.10(1)(B)*. *The IGC* then interviews the prisoner and, if appropriate, the staff person responsible for the area where the problem occurred. *103 C.M.R. § 491.10(1)(C)*. Within ten days of receiving the grievance, the IGC is to propose a resolution or deny the grievance, and provide the prisoner with a written explanation.  **[**30]** *103 C.M.R. § 491.10 (1) (E)-(F)*.

(continued…)

- 4 -

As Judge Gertner noted in *Shaheed-Muhammad v. DiPaolo*, under the regulations of the Massachusetts Department of Corrections, letters from inmates to prison staff can constitute grievances sufficient to exhaust administrative remedies in accordance with the PLRA.  393 F. Supp. 2d 80, 95 (D. Mass. 2005).  In *Shaheed-Muhammad*, the plaintiff wrote to the Imam of the institution requesting vegetarian Halal meals.  *Id.* at 96.  The Court agreed that the letter constituted a grievance even though it was not on a grievance form, as the applicable regulation stated that an inmate "may" use a grievance form.[2]  *Id.* at 97.  The Court agreed that the letter met all of the requirements for filing a grievance under the Massachusetts regulations.  *Id.*

The Court, noting that the prison officials had not responded to the inmate's letters, wrote: "Having failed to abide by the strictures of their own regulations, defendants should not be allowed to claim plaintiff's noncompliance as a bar." *Id.*  Likewise, Mr. Hudson and Mr. Tyler wrote letters to prison officials containing required information such as the date, the name of the inmate's institution, a brief statement of the facts, the required remedy, and signature by the inmate.

Mr. Hudson and Mr. Tyler have properly exhausted administrative remedies as required by the PLRA.  *See Woodford v. Ngo*, 126 S. Ct. 2378, 2387 (2006).  As the Supreme Court recently noted, the "primary purpose of a grievance is to alert prison officials to a problem" and to "provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit." *Jones v. Bock*, 2007 U.S. LEXIS 1325 (U.S. Jan. 22, 2007), quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (CA5 2004).  As the

---

*Shaheed-Muhammad*, 393 F. Supp. 2d at 95-96.

[2] Even though it is not mandatory, Plaintiffs filled out several grievance forms to DOC staff members.  *See* Exs. 13–15, 19, 25, 27.

BST99 1529554-2.009962.0179

correspondence in Exhibits 13 through 32 demonstrates, Plaintiffs have provided the required notice to the DOC and done so pursuant to the DOC's own policies.

### B.   Plaintiffs numerous requests to the DOC for religious items and services were summarily denied.

Attached hereto as Exhibits A and B are charts, prepared for the Court's convenience, summarizing Trial Exhibits 13–32, which contain Mr. Hudson's and Mr. Tyler's religious requests and the DOC's subsequent responses.

As illustrated in Exhibit B, Mr. Tyler wrote several letters to Sherry Elliott, the Director of Treatment of MCI-Cedar Junction, in August of 2001.  On August 8, 2001, Mr. Tyler reminded  Ms. Elliott that he had requested Halal meals in January or February, but had not heard from Ms. Elliot regarding the request (Ex. 13).  Mr. Tyler then renewed his request for Halal meals, and also requested access to Jum'ah services.  Mr. Tyler also addressed an "Inmate Request to Staff Member" form to the Imam at MCI-Cedar Junction, informing him that he had made requests to Ms. Elliot regarding prayer rugs and Halal meals.  He sent copies of his letters and requests to the superintendent.  (Ex. 14).  On August 16, 2001, Ms. Elliot responded by stating that inmates were provided with prayer towels not prayer rugs.  (Ex. 15).  Mr. Tyler again wrote to Ms. Elliot on August 15, 2001, requesting Halal meals and explaining that vegetarian meals designed for Seventh Day Adventist meals were not Halal. (Ex. 16).

Ms. Elliot, in responding to these requests, did not state that any of the grievances filed by Mr. Tyler were not filed properly.  Only after she had already responded on August 16, 2001 did Ms. Elliot inform Mr. Tyler that the Religious Review Committee had not received a package from him addressing his concerns.  (Ex. 17).  Additionally, she informed him that access to Jum'ah services was a complaint to be addressed to the Superintendent's Office.  Mr. Tyler then worked to correct any filing errors, writing again on Aug. 28, 2001 to Ms. Elliot

BST99 1529554-2.009962.0179

resubmitting his request for Halal meals (Ex. 19) and writing to the Superintendent requesting access to jum'ah services. (Ex. 20).

Likewise, Mr. Hudson wrote on many occasions to Ms. Elliott.  On January 2, 2001, he wrote to her to check on the status of his request for Halal meals, as well as to remind her of a letter he had written two weeks prior regarding requests for a prayer rug. (Ex. 21).  Mr. Hudson wrote to Ms. Elliot on July 11, 2001, to request access to Jum'ah services. (Ex. 26).  Finally, on July 26, 2001, Mr. Hudson wrote to the superintendent to complain about the denial of Jum'ah services and prayer rugs. (Ex. 28).  Superintendent Allen responded on August 15, 2001 and denied Mr. Hudson's requests outright. (Ex. 29).

Plaintiffs' letters and request forms all constitute written grievances in compliance with the Department of Corrections' policy.  *See* 103 C.M.R. § 403.10(9); 103 C.M.R. § 491.00. Furthermore, prison officials did not comply with the requirements of the grievance process by failing to alert the plaintiffs to any deficiencies in their grievances.  The only indication Plaintiffs received regarding a special form was a letter to Mr. Tyler regarding his request for Halal meals. *See* Exhibit 18.[3]  Mr. Tyler testified that, after receiving the letter from Ms. Elliott, he recalls filling out the religious services request form for his Halal meal request.[4]

In some cases, the DOC employees actually told Plaintiffs that their requests were, in fact, being reviewed by the RSRC.  For example, in her response to Mr. Hudson's July 11, 2001

---

[3] This letter from Ms. Elliott indicated that the nature of the Halal meal request made it necessary to refer it to the RSRC.  *See id*. ("Due to the nature of the request, it is necessary for the matter to be referred to the [RSRC]").  Therefore, Mr. Tyler did not fill out a special form for his request for Jum'ah services or prayer rugs because he did not receive notice that these requests were deficient or of such a nature as to warrant a special form.

[4] Mr. Tyler testified, and his written requests to Ms. Elliott substantiate, that the Director of Treatment would often misplace his written requests and he had to resubmit his requests on multiple occasions.  *See* Exs. 13-20.  It is not hard to believe that the religious services form Mr. Tyler completed and submitted to Ms. Elliott was similarly lost.

BST99 1529554-2.009962.0179

request for Jum'ah services, Ms. Elliot responded that "[Mr. Hudson's] Religious Services Request is in the hands of the Rel. Rev. Committee.  As answers become available from the Committee a letter will be sent to you.  Please keep in mind that the Committee meets quarterly." *See* Ex. 25 (in response to Ex. 26).  This admission from Ms. Elliott that she did forward Mr. Hudson's request for Jum'ah services to the RSRC flatly contradicts Defendants' claim that Mr. Hudson did not exhaust his administrative remedies.

With respect to all other requests for religious services or items, either Ms. Elliott or a superintendent denied the request directly, without forwarding it to the RSRC or notifying the Plaintiffs that the DOC wanted them to fill out an additional form.  Aside from Exhibit 18, there is no evidence that the DOC ever informed Plaintiffs of any special procedures outside of the governing regulations. The Defendant's unsupportable assertion that the Plaintiffs should have known about a special form or were actually told of it defies common sense.  The Defendant would have the Court believe that the DOC informed the Plaintiffs that a special committee would consider their requests if they would fill out a one page form, but that the Plaintiffs refused to fill out that form.  In light of the volume of communications between the Plaintiffs and the DOC relating to religious requests, one can hardly suggest that the Plaintiffs lacked the time or the motivation to follow up on their religious requests.  The evidence shows that the Plaintiffs were persistent in their grievances and would most certainly have filled out the proper form if instructed to do so.

As in *Shaheed-Muhammad*, the Court should not allow the defendant to claim Plaintiffs' non-compliance with undisclosed, technical requirements of the prison bureaucracy as a bar to suit.  Mr. Hudson and Mr. Tyler attempted to work with prison officials to remedy the denial of their religious rights.  Their initial letters and timely follow-up requests demonstrate that they

were not trying "to bypass available administrative remedies." *See Woodford*, 126 S. Ct. at 2388.  Instead, Plaintiffs made every effort to inform the DOC about their religious needs and each request was repeatedly and summarily denied.

### III.   THE DEFENDANT HAS WAIVED ANY ARGUMENT THAT MR. TYLER FAILED TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO HIS REQUEST FOR HALAL MEALS BY STIPULATING THAT THE RSRC DENIED HIS REQUEST

In addition to the evidence that Mr. Tyler submitted numerous requests for Halal meals and his testimony that he had, in fact, filled out and submitted a Religious Services Review form, the Defendant stipulated to the fact that Mr. Tyler's request for Halal meals was denied by the Commissioner.[5]  *See* Joint Pre-Trial Memo, Stipulation of Facts, ¶ 15.  Paragraph 15 of the Stipulation of Facts states:

> Former Commissioner of Correction Michael Maloney denied both plaintiff Tyler and plaintiff Hudson's requests for Halal meals based on recommendations from the Religious services Review Committee.

*See id*.  This stipulation was not an oversight by Defendant as this paragraph was drafted by Defendant's counsel during the pre-trial negotiations.  This stipulation supports Mr. Tyler's testimony and the evidence that, once he knew special procedures were available, Mr. Tyler did, in fact, submit the religious services form.

### IV.   THE DEFENDANT HAS WAIVED ANY EXHAUSTION DEFENSE BY SEEKING A DECISION ON THE MERITS

The Defendant has decided to litigate this case on the merits and, now, after years of litigation, she has chosen to change tactics and raise an exhaustion defense.  In five years of litigation, the Defendant raised the exhaustion defense only once –in opposition to the Plaintiffs'

---

[5] The Defendant has also stipulated that Mr. Hudson has exhausted all administrative remedies with regard to Halal meals and does not challenge Mr. Hudson's claim for Halal meals in her Motion for Judgment on Partial Findings.

motion to amend their complaint, which the Court decided in favor of the Plaintiffs.   The clear purpose of the PLRA is to reduce the number of suits *initiated* in court, not give the Defendant a last minute tactical defense in the final stages of litigation.

The PLRA's exhaustion requirement creates an affirmative defense.  *See Bock*, 2007 U.S. LEXIS 1325 at *32; *Casanova*, 304 F.3d at 77 & n.3.   This defense, like other affirmative defenses, is subject to waiver and estoppel.  *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir. 2001); *Perez v. Wisc. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999); *Wendell v. Asher*, 162 F.3d 887, 890 (5th Cir. 1998).

The Court should not permit the DOC to hide the ball by litigating a case on its merits and then, when it develops a well-founded fear of losing on the merits, resorting to an exhaustion defense.  In the five years that have passed since service of the original Complaint, Hudson and Tyler could have pursued whatever administrative remedies the DOC has made available, had their claims denied by whomever the DOC asserts are the proper administrative officials, and re-filed their lawsuit.  If the Court permits the DOC to assert this defense now, Hudson and Tyler will suffer additional delay while the DOC processes their grievances and responds with rejections that are all but guaranteed.

The DOC's late assertion of an exhaustion defense prejudices not only the Plaintiffs, but also the Court.  "The [PLRA] can function properly only if the judge resolves disputes about its application before turning to any other issue in the suit."  *Perez v. Wisc. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999).  In fact, requiring exhaustion allows prison officials an opportunity to "resolve disputes concerning the exercise of their responsibilities before being haled into court," not five years into the litigation.  *Bock*, *supra* at *10.  The defendant has an obligation to assert this defense as soon as possible—or not at all—in order to prevent the plaintiffs and the Court

BST99 1529554-2.009962.0179

from expending valuable time and resources on the merits of claims that are in an improper forum.

At the very least, a defendant who asks a court for a ruling on the merits by filing a motion for summary judgment and a motion for reconsideration should not later be heard to complain that an administrative body rather than a court should decide the merits of the plaintiffs' claims.

The Federal Rules of Civil Procedure recognize a division between defenses that go to the plaintiffs' choice of forum and defenses that go to the merits of a case.   Objections relating to whether the court is a proper forum—those based on lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service of process— must be raised at the outset of a lawsuit or not at all.  *See* FED. R. CIV. P. 12.  This division allows a court to first determine whether it should hear a case at all, and address the merits of a case only if it should.

The First Circuit has found that defendants may waive these forum-related defenses through litigation conduct even when the defendants have properly pled the defenses.  *See Mitchell v. Hobbs*, 951 F.2d 417, 422 (1st Cir. 1991) (holding that defendant waived defense of insufficient service of process through the conduct of his attorney); *Marcial Ucin, S.A. v. S.S. Galicia*, 723 F.2d 994, 997 (1st Cir. 1983) (holding that defendant waived defense of lack of personal jurisdiction by participating in litigation).  This Court should apply a similar waiver rule to the PLRA's exhaustion requirement.  *See Handberry v. Thompson*, Civ. No. 96-6161 (CBM), 2003 U.S. Dist. LEXIS 1220, at *11 (S.D.N.Y. Jan. 27, 2003) (finding waiver of PLRA exhaustion defense when defendant "clearly could have, and indeed should have, pursued the exhaustion issue" years earlier).

The Eighth Circuit explained the rationale behind this waiver rule in *Yeldell v. Tutt*, 913 F.2d 533 (8th Cir. 1990):

> While the [defendants] literally complied with Rule 12(h) by including the jurisdictional issue in their answer, they did not comply with the spirit of the rule, which is "to expedite and simplify proceedings in the Federal Courts." C. Wright & A. Miller, 5A Federal Practice and Procedure § 1342, at 162 (2d ed. 1990) (quoting *E.I. Du Pont De Nemours & Co. v. Dupont Textile Mills*, 26 F. Supp. 236, 236, 40 U.S.P.Q. (BNA) 422 (M.D. Pa. 1939)).
>
> This court, in *Alger v. Hayes*, 452 F.2d 841 (8th Cir. 1972), held that the defendant had waived his defense of lack of personal jurisdiction because his conduct did "not reflect a continuing objection to the power of the court to act over the defendant's person." *Id.* at 844. We rejected the defendant's attempt to maintain his jurisdictional objection while awaiting the outcome of the trial. <u>"We think this plays 'fast and loose' with the power of the federal court and we disavow tolerance of such a procedure."</u> *Id.* at 845.

*Id.* at 539 (emphasis added).  This Court, too, should not tolerate a procedure that burdens inmates and the courts with unnecessary litigation.

There was nothing preventing the Defendant from submitting an affidavit from Allison Hallett in 2001 when this case was filed, describing her search of the RSRC's computer database for requests submitted by the Plaintiffs, and seeking summary judgment on this basis then. Having chosen to litigate this case on the merits, the Court should not permit the DOC to change course five years later during the trial.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Defendant's Motion for Judgment on Partial Findings.

- 12 -

Respectfully Submitted,

MAC S. HUDSON and DERICK TYLER

By their attorneys,


 /s/ Neal E. Minahan
Michael Kendall (BBO #544866)
Benjamin A. Goldberger (BBO#654357)
Neal E. Minahan (BBO#661371)
McDermott Will & Emery LLP
28 State Street
Boston MA 02109-1775
(617) 535-4000

Dated:  January 25, 2007

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 25, 2007.

 /s/ Neal E. Minahan
Neal E. Minahan

BST99 1529554-2.009962.0179